UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SCOTT A. CAMPBELL, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. 1:17-cv-11134-IT |
| | * | |
| MASSACHUSETTS PARTNERSHIP | * | |
| FOR CORRECTIONAL HEALTHCARE, | * | |
| LLC, and LAWRENCE CHURCHVILLE, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

June 19, 2020

TALWANI, D.J.

Plaintiff Scott Campbell brings this *pro se* action against Defendants Massachusetts Partnership for Correctional Healthcare, LLC ("MPCH") and Dr. Lawrence Churchville, a physician employed by MPCH. Plaintiff alleges Dr. Churchville delayed needed medical care, violating Plaintiff's Eighth Amendment rights and causing injury, and seeks damages and declaratory relief under 42 U.S.C. § 1983. Plaintiff also brings medical malpractice claims against both Defendants under state law. Before the court is Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint [#52]. Because the court finds that Plaintiff has adequately pleaded Dr. Churchville acted with deliberate indifference, the Motion to Dismiss Plaintiff's Second Amended Complaint [#52] is DENIED.

I.   Procedural History

Plaintiff's Amended Complaint [#7] named MPCH, Dr. Churchville, Nurse Byron Shoemaker, and two other MPCH employees as defendants. On review pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A, the court allowed Plaintiff to serve MPCH, Dr. Churchville

and Nurse Shoemaker, dismissed Plaintiff's claims against the two other MPCH employees, and dismissed without prejudice Plaintiff's § 1983 claim against MPCH. Order [#10]. Once served, Defendants filed a Partial Motion to Dismiss [#28], which the court granted, dismissing claims against Shoemaker, and dismissing claims against Dr. Churchville with leave to amend. Order [#38]. Plaintiff filed his Second Amended Complaint ("SAC") [#46], accompanied by a Memorandum of Law in Support of Claim of Deliberate Indifference in a Medical Care Claim [#47] and a Memorandum of Law Respondeat Superior [#48]. Defendants filed the pending motion seeking dismissal under Fed. R. Civ. P. 12(b)(6) of Plaintiff's federal claim and asking the court to deny supplemental jurisdiction over Plaintiff's medical malpractice claims if the court dismisses Plaintiff's § 1983 claim. In his opposition, Plaintiff has clarified that he is not bringing a § 1983 claim against MPCH. Pl.'s Resp. to Mot. to Dismiss 5 [#59].

II.     Facts as Alleged in the Second Amended Complaint

For the relevant period, Campbell was incarcerated at MCI-Norfolk. SAC ¶ 4 [#46].

On May 11, 2015, at approximately 4:30 p.m., Campbell suddenly felt dizzy and fell down while walking on the prison's East Field track. Id. ¶ 7. Correctional staff on the scene summoned an emergency response team from the Health Services Unit ("HSU"). Id. ¶ 8. Campbell informed medical staff he had a headache, extreme vertigo, and was unable to stand or walk and medical staff placed Campbell in a wheelchair to travel to the HSU. Id. ¶ 9. On the way to the HSU, Campbell began to vomit profusely. Id.

At the HSU, Campbell was examined by Nurse Shoemaker, who was unable to diagnose Campbell's condition. Id. ¶ 10. No doctor was present for the examination as Dr. Churchville, the MPCH doctor assigned to MCI-Norfolk, had already left for the day. Id. ¶¶ 6, 10. At approximately 5:00 p.m., Shoemaker paged Dr. Churchville as the on-call doctor to decide upon

Campbell's course of treatment. Id. ¶ 10. Churchville responded to the page and ordered Campbell be treated for possible dehydration and placed in the Assisted Daily Living unit for observation. Id. ¶ 11. Churchville stated he would examine Campbell the next morning when he returned to the prison. Id.

Campbell did not receive further testing or examination that day. Id. ¶ 12. He was confined to bed and continued to experience dizziness and intense vomiting and could not walk. Id. Orderlies assisted Campbell to the bathroom, and he needed help after falling out of bed repeatedly while attempting to sit up or roll over. Id.

Dr. Churchville examined Campbell at approximately 9:00 a.m. the next day and found Campbell still unable to stand and vomiting. Id. ¶ 13. After a cursory coordination test, Churchville was unable to determine the cause of Campbell's condition and ordered Campbell back to the Assisted Daily Living unit, prescribing an antibiotic for a possible ear infection. Id. No further testing was ordered, and Campbell was not seen by staff during the rest of the day except to be given the antibiotic twice. Id.

At approximately 9:00 a.m. the following day, Dr. Churchville again examined Campbell and observed that Campbell's condition had not improved. Id. ¶ 14. Churchville "immediately upgraded" Campbell's status and ordered Campbell be sent to Norwood Hospital. Id. Campbell arrived at the hospital's emergency room at approximately 10:00 a.m. and was examined by Dr. Henry Rosenkranz, who told Campbell he suspected some sort of head injury based on Campbell's symptoms. Id. ¶ 15. The doctor ordered an emergency MRI exam. Id. The MRI technician stopped the test early based on his assessment that Campbell needed immediate medical treatment. Id. ¶ 16.

Campbell was returned to the emergency room where Dr. Rosenkranz stated the test

revealed evidence that Campbell had suffered one or two strokes and that it was possible that Campbell would need a drain implanted in his skull and therefore needed to be transferred to the head trauma wing of Boston Medical Center's ("BMC") intensive care unit. Id. ¶ 17. Dr. Rosenkranz informed Campbell that the delay in moving him to a hospital "negated an important 2-4 hour window" for treatment and therefore the delay was likely crucial to the second stroke. Id. ¶ 18. According to Dr. Rosenkranz, treatment with a "Tissue Plasminogen Activator," used as a matter of course to halt and reverse damage from a stroke would have probably prevented further strokes and prevented Campbell's permanent brain damage. Id. ¶ 19.

Campbell was taken to BMC and, over five days, underwent numerous tests. Id. ¶ 20. The attending neurologist confirmed that Campbell suffered two strokes and that the lack of prompt treatment was instrumental in the occurrence of the second stroke. Id. ¶ 21.

### III. Standard of Review

In considering a motion to dismiss under Rule 12(b)(6), this court must evaluate "whether all the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 14 (1st Cir. 2011) (emphasis omitted). The court "presumes that the facts are as properly alleged by plaintiffs and/or reflected in other properly considered records, with reasonable inferences drawn in the plaintiffs' favor." Abdallah v. Bain Capital LLC, 752 F.3d 114, 119 (1st Cir. 2014). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Additionally, a document filed *pro se* is "to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v.

Gamble, 429 U.S. 97, 106 (1976)).

    IV.    Analysis

        A.  § 1983 Claim against Dr. Churchville

Plaintiff asserts, under 42 U.S.C. § 1983, that Dr. Churchville's "failure to provide adequate care with the knowledge and evidence of an obvious medical need requiring substantially more attention than was . . . administered" constituted a violation of Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Pl.'s Resp. to Mot. to Dismiss 2–3 [#59].

In order to state a cognizable Eighth Amendment claim based on delayed or denied medical care, a plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106. Courts have identified two prongs within this standard, requiring allegation that: 1) plaintiff had a serious medical need (the "objective prong"), and 2) the defendant was deliberately indifferent to that need (the "subjective prong"). Kosilek v. Spencer, 774 F.3d 63, 82–83 (1st Cir. 2014). A serious medical need is "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990).

Defendants do not argue that Campbell's condition did not constitute a "serious medical need" or that Campbell has not plausibly pleaded he received inadequate medical care. Defs.' Mem. in Support of Mot. to Dismiss 8 [#53]. However, Defendants contend that Campbell has failed to plausibly allege that Dr. Churchville's actions were deliberately indifferent. Id. 9–11; see also Defs.' Reply 2 [#62] (asserting that Dr. Churchville took "immediate and reasonable steps to attempt to diagnose and treat Plaintiff in a timely manner.")

Deliberate indifference encompasses "a narrow band of conduct" in the context of delayed or denied medical care for an inmate. Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 162 (1st Cir. 2006). "[S]ubpar care amounting to negligence or even malpractice does not give rise to a constitutional claim." Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011); see also Estelle, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Deliberate indifference is therefore "characterized by 'obduracy and wantonness, not inadvertence or error in good faith." Leite v. Bergeron, 911 F.3d 47, 52 (1st Cir. 2018) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). The "obvious case" is "a denial of needed medical treatment in order to punish the inmate." Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)). Yet, while "deliberate indifference entails something more than mere negligence," it may also be shown "by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. Deliberate indifference may therefore be shown through allegations of care "so clearly inadequate as to amount to a refusal to provide essential care" or "so inadequate as to shock the conscience." Kosilek, 774 F.3d at 83, 92 (quoting Torraco v. Maloney, 923 F.2d 231, 234–35 (1st Cir. 1991)). In addition, "decisions about medical care made recklessly with actual knowledge of impending harm, easily preventable[,]" may constitute deliberate indifference. Leavitt, 645 F.3d at 497 (internal quotations and citations omitted). The standard, "requiring an actual, subjective appreciation of risk, has been likened to the standard for

determining criminal recklessness." Giroux v. Somerset Cty., 178 F.3d 28, 32 (1st Cir. 1999).

Taking Plaintiff's well-pleaded allegations as true and construing his complaint liberally, Campbell has plausibly pleaded that Dr. Churchville acted with deliberate indifference on May 11, 2015, the first evening that Campbell manifested his symptoms. While this is not an "obvious case" with allegations of delayed or denied care to punish an inmate, Plaintiff's allegations as to Dr. Churchville's response, as the on-call physician, could amount to "care so clearly inadequate as to amount to a refusal to provide care." Torraco, 923 F.2d at 234; see also Perry v. Roy, 782 F.3d 73, 80 (1st Cir. 2015) (considering defendants' decision to adopt "wait-and-see" approach to plaintiff's serious medical need after performing allegedly insufficient examinations as part of deliberate indifference analysis). Campbell states that, upon collapsing, he was unable to walk and experienced dizziness and vertigo and then commenced vomiting while being taken to the medical unit. SAC ¶¶ 7, 9 [#46]. The nurse at the prison contacted Dr. Churchville for assistance. Id. ¶ 10. Dr. Campbell's sole response was to direct treatment for dehydration and to send him to the Assisted Daily Living unit, resulting in Campbell's confinement in bed overnight with no further examination or tests for more than fifteen hours. Id. ¶¶ 10–13. During that period, Campbell continued to experience dizziness and "frequent bouts of intense vomiting," was unable to walk, and repeatedly fell when trying to sit up or roll over in bed. Id. ¶ 12. Campbell also alleges that, upon being examined at the hospital two days later, Dr. Rosenkranz suspected some sort of head injury in light of Campbell's symptoms. Id. ¶ 15. And, Plaintiff asserts, Dr. Churchville's delay of treatment caused Campbell more harm, as hospital doctors informed him that his second stroke would likely have been prevented with timely appropriate treatment. Id. ¶¶ 18–19, 21.

Therefore, Plaintiff has alleged that despite displaying serious symptoms that may have

been clear signs of a possible stroke or head injury, he received minimal treatment for more than fifteen hours after Dr. Churchville, the on-call physician, was contacted. Based on these allegations, it is plausible that Plaintiff can show that it was obvious that he was in need of emergency care and that Dr. Churchville nonetheless disregarded the risk of danger to Plaintiff, ordering de minimis treatment that functionally amounted to the refusal to provide care. See Perry, 782 F.3d at 79–80; Loe v. Armistead, 582 F.2d 1291, 1292, 1296 (4th Cir. 1978) (holding plaintiff stated a claim by plausibly alleging "it was obvious" that his arm was broken based on swelling and his inability to move it, but that defendants nevertheless waited 11 hours for an evaluation by a doctor and almost a day before transporting the plaintiff to a hospital, only prescribing pain medication in the meantime); Ferris v. Cty. Of Kennebec, 44 F. Supp. 2d 62, 67 (D. Me. 1999) (denying motion to dismiss upon allegations that, when informed by plaintiff of bleeding that might indicate a miscarriage, defendant merely took plaintiff's pulse and told plaintiff to lie down).

Thus, Campbell has met his pleading burden in plausibly alleging that Dr. Churchville acted with deliberate indifference.[1] This is enough, under Fed. R. Civ. P. 12(b)(6), to allow Plaintiff's § 1983 claim to proceed.

B. Medical Malpractice Claims

Defendants additionally ask the court to deny supplemental jurisdiction over Plaintiff's

---

[1] While Plaintiff has plausibly pleaded that Dr. Churchville acted with deliberate indifference on May 11, 2015, when he was on call and allegedly failed to evaluate and treat Plaintiff, the court does not base its holding on Dr. Churchville's alleged actions on May 12, 2015, when he did examine Plaintiff and prescribed an antibiotic for a possible ear infection. See Watson, 984 F.2d at 540 (distinguishing between a refusal to treat with a failure to choose an optimal treatment plan, stating, as to the latter, "[t]o append labels like 'wanton' or 'deliberate indifference' to this conduct, when nothing suggests that the medical judgment was absurd or that improper reasons were given for refusing treatment, cannot alter what is in essence a claim of negligence.")

medical malpractice claims if the court dismisses Plaintiff's § 1983 claim. Because the § 1983 claim may proceed, the court retains supplemental jurisdiction over the medical malpractice claims.

V.     Conclusion

Accordingly, Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint [#52] is DENIED.

IT IS SO ORDERED.

Date: June 19, 2020                                    /s/ Indira Talwani
                                                       United States District Judge